IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                          Case No. 3:15cr138

EUGENE HARRIS,

   Defendant.

## MEMORANDUM OPINION

On November 11, 2015, Defendant Eugene Harris filed a Motion to Suppress. (ECF No. 12.) The United States filed a response in opposition. (ECF No. 17.) Harris did not file a memorandum in reply to the United States' response, and the deadline to do so has expired. On November 24, 2015, the Court held a hearing on the pending motion. Following the hearing, the Court allowed submission of additional briefing. On January 5, 2016, Harris filed his supplemental memorandum. (ECF No. 20.) On January 19, 2016, the United States filed its supplemental response memorandum. (ECF No. 21.) On January 31, 2016, Harris filed his supplemental reply memorandum. (ECF No. 23.)

On February 3, 2016, the parties appeared for final argument on the Motion. Accordingly, this matter is ripe for adjudication. For the following reasons, and for the reasons stated on the bench at the February 3, 2016 hearing, the Court will deny the Motion to Suppress. (ECF No. 12.)

## I. Procedural Background and Findings of Fact

### A.   Procedural History

On August 5, 2015, the grand jury returned a three-count indictment against Harris. Harris was charged with possession with intent to distribute cocaine, in violation of 21 U.S.C.

§ 841;[1] possession with intent to distribute heroin, in violation of 21 U.S.C. § 841; and,

possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[2] (ECF

No. 1.)

Harris filed a Motion to Suppress, arguing this Court must suppress the evidence against

him because it was obtained pursuant to an unlawful search without consent in violation of his

Fourth Amendment[3] rights. On November 24, 2014, the Court held a hearing on the Joint

---

[1] 21 U.S.C. § 841 states, in pertinent part: "(a) Unlawful acts. Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1).

[2] 18 U.S.C. § 922(g)(1) states, in pertinent part:

(g) It shall be unlawful for any person--

> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

[3] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Motion to Suppress. Virginia State Police Trooper Cesar Nunez[4] ("Trooper Nunez" or "Nunez") and Virginia State Police Trooper Brandon Crockwell[5] ("Trooper Crockwell" or "Crockwell") testified for the United States. Harris called Virginia State Trooper Trainee Stephen Phillips[6] ("Trainee Phillips" or "Phillips") as an adverse witness. The United States introduced into evidence maps and charts of the traffic stop (Nov. 24, 2015 Hr'g ("Hr'g") U.S. Exs. 1A–1D, 2A, 2C–2E); photographs of the interior of Trooper Crockwell's, Trooper Nunez's, and Harris's vehicles (Hr'g U.S. Exs. 3A & B, 6A &B, 7A–7D); summonses issued to Harris on April 25, 2015 (Hr'g U.S. Exs. 4–5); a synopsis and report by Trooper Nunez (Hr'g U.S. Exs. 9–10); and, six warrants issued to Harris (Hr'g U.S. Exs. 12A–12F). After supplemental briefing in January of 2016, the Court heard oral argument on February 3, 2016. Based on the evidence and briefing presented by the parties, the Court makes the following factual findings.

## B.   **Findings of Fact**

At approximately 8:15 a.m. on April 25, 2015, Virginia State Trooper Brandon Crockwell was on patrol near the intersection of Broad Street and 17th Street in Richmond,

---

[4] Trooper Nunez has served as a state trooper for nearly four years. He has a technical degree and some college experience. As part of his involvement with the Virginia State Police, he has worked with the "Firearms Fugitive Initiative" and has taken a 40-hour class with the Drug Enforcement Administration called "Operation Pipeline and Convoy" that teaches officers to engage in interdiction work. (Nov. 24, 2015 Hr'g Tr. ("Hr'g Tr.") 9, 64–65, ECF No. 19.)

[5] Trooper Crockwell has been a state trooper for approximately three years. He holds an associate's degree.

[6] At the time of the April 25, 2015 traffic stop, Trainee Phillips was on a probationary training status with the Virginia State Police. He had attended a "crash course" with the police academy for two weeks and then had been training with Nunez for approximately two months. (Hr'g Tr. 175–76.) During his training with Nunez, Phillips conducted over 30 vehicle searches. At the time of the November 24 hearing, Trainee Phillips was enrolled in the Virginia State Policy Academy as a trooper trainee.

Virginia. As Trooper Crockwell drove west on Broad Street, he saw a 1994 white Mercury Marquis in the left lane. Trooper Crockwell noticed a crack in the windshield of the Mercury and observed that the driver, who he would later discover to be Harris, was not wearing a seatbelt. At a red light, the two vehicles sat nearly side by side. When the light turned green, the Mercury suspiciously did not proceed forward at first, instead letting Trooper Crockwell's police cruiser drive ahead. Harris drove behind Trooper Crockwell for a period, who then allowed Harris to pass him. When Harris used an on-ramp to get onto Interstate 95, Trooper Crockwell followed.

Troopers Nunez and Crockwell testified that as Harris drove in the center lane on Interstate 95 nearing Exit 75, he swerved into the left lane without apparent justification. That lane was occupied by a marked police cruiser driven by Trooper Nunez, who was accompanied by Trainee Phillips in the passenger seat. Harris's swerve forced Nunez to veer off the road into the shoulder.[7] After Harris swerved into the left lane, Trooper Crockwell activated his emergency lights to conduct a traffic stop for Harris's failure to wear his seat belt[8] and his defective windshield.[9]

---

[7] "A vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely." Va. Code § 46.2-804(2).

[8] "Any driver . . . of a motor vehicle . . . shall wear the appropriate safety belt system at all times while the motor vehicle is in motion on any public highway." Va. Code § 46.2-1094(A). A seat belt citation is a secondary offense in Virginia. Id. § 46.2-1094(F).

[9] "It shall be unlawful for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment . . . which is defective or in unsafe condition." Va. Code § 46.2-1003.

Although Harris ultimately complied by pulling over onto the side of the road, he did not

do so expediently. He proceeded off the next exit and, instead of pulling into the widest area of

the shoulder, he continued in an abnormal manner down the exit ramp until the shoulder was so

narrow that his car partially blocked the line of traffic. Because of the constricted shoulder, the

officers had to park their cars in a line instead of side-by-side. Crockwell parked his car

immediately behind Harris. Nunez parked his car behind Crockwell.[10] Harris's extended drive

before stopping alerted both Crockwell and Nunez's suspicions. First, the unnecessarily lengthy

drive indicated to both officers that Harris could be concealing something or could be under the

influence of alcohol or drugs. Additionally, Crockwell's vantage point directly behind Harris's

car showed Harris "moving around a lot" in the car, indicating to him that Harris could be hiding

contraband or preparing a weapon. (Hr'g Tr. 122.)

Because of Crockwell's concerns as to Harris's sobriety, as well as his unease about the

possibility of a weapon, he "bladed" his firearm, meaning that he held his gun concealed behind

his leg, as he walked to greet Harris at the passenger door of Harris's car. (Hr'g Tr. 15–17.)

However, he quickly found Harris to be compliant and holstered his weapon. No evidence exists

that Harris ever saw Crockwell's weapon out of its holster. During the first interaction between

Crockwell and Harris, Nunez and Phillips stood between Harris's car and Crockwell's police

---

[10] Crockwell's vehicle had no cameras installed. Nunez's vehicle contained a camera, but he did not activate it because Crockwell's car was directly behind Harris's car. Nunez believed that Crockwell's car had a camera recording the interactions. Nunez presumed Crockwell had a camera because "more than 90 percent" of troopers in his area had cameras. (Hr'g Tr. 21.)

The Court does not find that the lack of a recording prevents a finding of knowing and voluntary consent, because the Court heard credible, materially consistent testimony from three unimpeached witnesses. *See United States v. Lattimore*, 87 F.3d 647, 649 n.* (4th Cir. 1996) (relying on officer's testimony to clarify consent when audio recording was so poor as to be deemed inaudible).

cruiser. Crockwell informed Harris that he had stopped him for the cracked window and seat belt violations. Crockwell then returned to his police car to write summonses for these violations.

While Crockwell sat in his car writing the summonses, Nunez approached Harris's car by the passenger side door to engage in "casual conversation" about his swerve into the left lane, about where Harris had come from and where he was going. (Hr'g Tr. 27–28, 78, 80.) Through the passenger side, Nunez saw (1) Chronic Spray, which is "typically used to mask the odor of marijuana;" (2) rolling papers, or the external parts of tobacco cigars commonly used to form marijuana cigars; and, (3) "blunt guts," or the emptied contents of tobacco cigars. (Hr'g Tr. 27–31.) Nunez also spoke with Harris and saw his hands "shaking nervously." (Hr'g Tr. 31.) Nunez informed Crockwell of his observations. Although both officers thought the activity was suspicious, they agreed they did not have probable cause to arrest Harris.

In addition to Nunez's suspicious observations, Trooper Crockwell also saw Harris acting in a lethargic manner and thought he detected the odor of alcohol. Around 8:35 a.m., Crockwell asked Harris to return to the area behind his car to issue and explain the summonses for the traffic violations.[11]

---

[11] Crockwell was not always clear as to the order of events. However, when challenged on cross examination, he confirmed the order of events as detailed in this Memorandum Opinion. The summonses contain issuance times of 8:34 and 8:35 a.m., aligning with Crockwell's clarified timeline of events, which began with a traffic stop around 8:15 or 8:20 a.m. Trooper Nunez testified to a slightly different progression of events, remembering instead that the field sobriety tests were conducted prior to the issuance of the summonses. Trooper Crockwell also recalled asking Harris to step out of his car only once, while Nunez remembered Harris leaving his car two times. The Court, in evaluating this evidence, finds it more likely than not that Harris stepped out of the car only once. The officers' testimony, while slightly inconsistent, lends credibility to the genuine, unrehearsed nature of the testimony. In any event, even if Harris left

He asked Harris to step out of the vehicle, and Harris complied. Crockwell continued to smell alcohol and suspected that Harris could be under the influence.[12] In the space between Harris's and Crockwell's cars, Crockwell had Harris perform three field sobriety tests and take a preliminary breath test. Although he showed signs of impairment, Harris "blew" a .057, below the legal limit of .08.[13] Crockwell allowed Harris to return to his car, with the understanding that Crockwell would issue the traffic summonses and simply follow Harris to his destination to ensure his safety. At this time, neither Crockwell nor Nunez had determined to arrest Harris. During Crockwell's conversations with Harris and the subsequent sobriety tests, Officer Nunez and Trainee Phillips "stood quiet" by Trooper Crockwell's vehicle. (Hr'g Tr. 78.) Phillips did not speak to Harris at all.

After Harris completed the field sobriety tests and signed the summons, Crockwell told Harris he was "good to go" or "free to leave." (Hr'g Tr. 33, 90, 99, 137, 163.) Harris began walking back to his car. As he came close to the driver's side door, either Nunez or Crockwell called to Harris and queried whether Harris would answer a few questions. Harris agreed and walked back to the area between his car and Crockwell's, where all four men stood in "close proximity," with Nunez between Harris and Harris's car. (Hr'g Tr. 93, 94, 96.) Nunez then asked Harris for consent to search his car for training purposes because Nunez had a trainee with

---

his car twice, for the reasons articulated below, nothing on the record establishes coercive circumstances.

[12] When Crockwell asked Harris if he had been drinking, Harris admitted to having had a "few beers" the night before. (Hr'g Tr. 26, 77, 129.)

[13] "It shall be unlawful for any person to drive or operate any motor vehicle . . . while such person has a blood alcohol concentration of 0.08 percent or more . . . ." Va. Code § 18.2-266(i).

him.[14] Harris verbally agreed, emphasizing that he did not have anything illegal such as drugs, guns, or weapons. Throughout this conversation, the tone was "friendly." (Hr'g Tr. 36, 93.)

Trainee Phillips began the search of Harris's car. Neither Nunez nor Crockwell saw Phillips start the search, but when he reached the driver's side door, he called to Nunez that he had found something. When Phillips alerted Nunez, Crockwell heard Harris say, "Oh, man, you're going to find it." (Hr'g Tr. 141–42.) Phillips and Nunez then found narcotics inside an eyeglasses case on the driver's seat near the seat belt buckle. After Nunez and Phillips saw the silhouette of a gun under the driver's seat, they recovered a loaded .38 caliber semi-automatic pistol. Harris never objected to the search or its scope.

Based on the discovery of the firearm and suspected narcotics, the officers put Harris in handcuffs. After his arrest, Nunez read Harris his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Harris then admitted to having ten to eleven grams of cocaine and two to three grams of heroin. He denied any knowledge of the gun. During their search of his person, they found $2,015. After the officers placed Harris in custody, they remained at the traffic stop to wait for a tow truck to impound Harris's car. During that time, Harris and the officers continued "casually talking." (Hr'g Tr. 147.) After his arrest, the conversation included Harris offering a $10,000 bribe if the officers would drop the charge.[15]

---

[14] Nunez testified that he had used this technique to gain consent to search a number of times since Phillips had been training with him. Crockwell also testified generally to trying to get consent in order to train Phillips. Harris points to no authority, and this Court finds none, holding that such a request is unconstitutional or otherwise unlawful. The Supreme Court long has held that "consent searches are part of the standard investigatory techniques of law enforcement." *Schneckloth v. Bustamonte*, 412. U.S. 218, 231 (1973).

[15] Harris is not indicted on any bribery charges before this Court. Further, Harris does not challenge any of the officers' conduct regarding any alleged bribe. During the November 24

## II. Analysis

The Court finds that the United States has met its burden of proof to show by a preponderance of the evidence that the search of Harris's car was conducted pursuant to Harris's knowing and voluntary consent. Therefore, the Court will deny the Motion to Suppress.

### A. Applicable Law

The United States bears the burden of establishing the admissibility of evidence obtained as the result of a warrantless search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). A search pursuant to consent is a well-established exception to the warrant requirement. *Lattimore*, 87 F.3d at 650. When the United States asserts that a search was valid based on consent, the government must show "that the consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (citation omitted).

In the analysis of whether consent was freely and voluntarily given, the Court must look to the totality of the circumstances and make a fact-based determination. *Lattimore*, 87 F.3d at 650. The Court may consider, among other facts, the "characteristics of the accused," including his or her age and experience with the criminal justice system, and the "conditions under which the consent to search was given, 'such as the officer's conduct, the number of officers present, and the duration, location, and time of the encounter.'" *Id.* (citations omitted). The Court may also look to whether the accused knew he or she had the right to refuse consent, but this factor cannot be dispositive. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *see also Schneckloth*, 412 U.S. at 231 (rejecting any proposed requirement of advising a subject of his or her right to refuse consent before eliciting such consent).

---

hearing, the Court limited the argument regarding the purported bribe, finding most of the events following the initial offer irrelevant to the consent issue.

The Court must measure the scope of a search by looking to objective reasonableness: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations omitted). The United States Court of Appeals for the Fourth Circuit holds that this objective reasonableness standard means that "when a suspect gives his [or her] general and unqualified consent for an officer to search a particular area," the officer need not ask for additional consent to "search a closed container within that area." *United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004) (citing *Jimeno*, 500 U.S. at 251).

## B. The United States Met Its Burden to Show By a Preponderance of the Evidence that Harris Gave the Officers Knowing and Voluntary Consent to Search His Vehicle

After weighing the evidence and evaluating the credibility of the testifying witnesses, the Court finds that the United States met its burden to show, by a preponderance of the evidence, that the officers' search of Harris's vehicle was constitutional. The totality of the circumstances, including Harris's characteristics and the conditions under which he gave consent, demonstrates that Harris gave knowing and voluntary consent to search his vehicle. Further, the officers did not exceed the scope of the consent.

Harris's characteristics and the nature of the conditions under which the consent was given both indicate that the consent was not a product of coercion. First, Harris, a 33 year old adult, likely understood his rights. The third count in his pending indictment, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), suggests that Harris has some experience in the criminal justice system. *See Boone*, 245 F.3d at 362 (noting that the defendant's previous felony convictions "suggest[ed] that he was not a newcomer to the law").

10

Nothing indicates that Harris was under the influence of drugs or alcohol to the point at which he could not understand the situation. While the officers thought that Harris was "lethargic," he tested below the legal limit and admitted to drinking only a "few beers" the night before. (Hr'g Tr. 26, 77, 129.) He was able to engage in "casual," "friendly" conversation with the officers. (Hr'g Tr. 36, 93, 147.) Thus, none of Harris's characteristics demonstrate that his consent was a product of coercion.

Second, the circumstances under which Harris gave his consent do not indicate any coercive factors. The traffic stop took place in broad daylight, beginning around 8:15 a.m. on a well-traveled interstate, and did not last for an unreasonable duration.[16] It appears consent was obtained approximately 15 minutes into the stop. In the span of that time, Trooper Crockwell ran Harris's information and wrote, explained, and issued two summonses. Harris also took three field sobriety tests and a preliminary breath test. While Crockwell wrote the summonses, Nunez spoke with Harris about the conduct that had separately alerted Nunez to Harris: his swerve toward Nunez on I-95.[17] Finally, Trainee Phillips and Trooper Nunez searched Harris's car. Under the circumstances of this case, the Court does not find unreasonable the length of the stop

---

[16] Harris does not challenge the scope or duration of the traffic stop. *See United States v. Digiovanni*, 650 F.3d 498, 509 (4th Cir. 2011) ("[A] traffic stop must be reasonable both in its scope and duration." (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Nonetheless, the Court may examine these factors in its consideration of the nature of the circumstances under which Harris gave consent. *See Lattimore*, 87 F.3d at 651.

[17] Harris rightly does not challenge this event because the evidence supports a finding that the conversation "did not extend the length of time [Harris] was detained." *Digiovanni*, 650 F.3d at 508 (citing *Arizona v. Johnson*, 555 U.S. 323, 327–34 (2009)). Indeed, Trooper Nunez did not appear to engage in questioning wholly unrelated to events that day: he, with Crockwell, had just witnessed Harris violate Virginia Code § 46.2-804(2) by nearly running Nunez off the road.

for these activities.[18] *See Lattimore*, 87 F.3d at 651 ("The [traffic stop and subsequent consent to search] occurred on a well-travelled highway, during the middle of the afternoon, and was not of inordinate duration."). No evidence exists that Harris saw that Officer Crockwell "bladed" his firearm from his vantage point on the driver's side of the car.

Further, although three officers were involved in the encounter, the evidence does not suggest that the interactions were threatening or intimidating. *See United States v. Drayton*, 536 U.S. 194, 204 (2002) (noting that three officers on a bus, even though they physically blocked the exit, were not coercive when they did not apply or show force, exhibit threats or commands, or brandish weapons). Instead, the evidence showed that Nunez became alerted to Harris's

---

[18] Despite Harris's reliance on *Digiovanni*, significant factual differences exist between Harris's case and the facts in that case. In *Digiovanni,* the Fourth Circuit held not "implausible" the district court's finding that the defendant's consent was involuntary. *Id.* at 514. After executing a traffic stop for following too closely, the officer repeatedly questioned Digiovanni on unrelated matters—drug trafficking—for ten minutes before even checking his driver's license. 650 F.3d at 504, 514. Next, the officer obtained verbal consent to search the defendant's car but could not open the trunk to search and thus discovered no contraband. *Id.* at 504. Finally, after issuing the defendant a warning ticket, the officer again asked to search the car, "implying that Digiovanni was bound by the earlier given verbal consent to search." *Id.* Based on the second "consent" search, the officer found controlled substances. *Id.*

The Fourth Circuit reviewed the district court's holding under an "extremely deferential standard of review," *id.* at 515, and agreed that the officer "did not diligently pursue the traditional purposes of a traffic stop," *id.* at 510. Because of the officer's dilatory tactics, his repeated questions about drug trafficking during a "following too closely" stop, and his false implication that a prior consent bound the defendant on a later search, the Fourth Circuit agreed with the district court's conclusion that the second consent was involuntary. *Id.* at 515.

No similar lack of diligence or untruthful implication surrounding consent exists in this case. Rather, the evidence suggests that Trooper Crockwell consistently pursued the purpose of the stop: to issue a traffic ticket for a broken windshield and lack of seat belt. Trooper Crockwell conducted field sobriety tests and a preliminary breath test, all appropriate after smelling alcohol on Harris's person and Harris's admission of having consumed a "few beers" the night before. Further, Harris's preliminary breath test reflected some alcohol in his blood. Both officers had seen at least one traffic violation. Only after these legitimate events transpired did the request arise to search Harris's car. Accordingly, *Digiovanni* does not persuade the Court.

conduct, and participated in the stop, only after Harris nearly swerved into him on I-95. Thus, Nunez and Phillips's presence flowed directly from a separate action by Harris that involved a second police car, not from a coordinated show of force. Further, no evidence exists that the officers commanded Harris to comply or even spoke to him in an "authoritative tone of voice."[19] *Id.* The credible testimony is consistent with one lead officer, and then a second trooper, making restrained decisions during changing circumstances within a traffic stop.[20] Indeed, the testimony established that the exchanges were friendly and that the men conversed easily. Nothing suggests that Harris's will to deny was unconstitutionally overborne. Indeed, Harris's offer of a bribe evinces mettle inconsistent with that of someone whose will had been overcome. Finally, the officers did not need to advise Harris of his right to refuse consent. *Ohio v. Robinette*, 519

---

[19] Trooper Nunez testified that he called to Harris to inquire whether he could ask him "several questions." (Hr'g Tr. 90.) Officer Crockwell testified that *he* called out to Harris to ask whether Harris could spare "a few moments of his time." (Hr'g Tr. 161.) Trainee Phillips stated that it was Trooper Crockwell who requested that he "ask one more question." (Hr'g Tr. 181.) Harris concedes that the slightly different testimony regarding which trooper called to Harris to ask "several" or a "few" questions, or "one more" question does not constitute a "vast[ ]" difference. (Harris Supp'l Reply Mem. 5, ECF No. 23.) The Court agrees. Whether Trooper Crockwell, Trooper Nunez, or both asked the follow up question, no testimony elicited indicated the tone of the exchange was coercive or even authoritative. Rather than finding that this testimony lacks credibility because of minor inconsistencies, this Court finds that the testimony convincingly portrays the unfolding of unplanned events. The officers testified consistently as to major events, and a lack of full agreement on the sequence of other events tends to lend credibility rather than the reverse.

[20] For instance, Crockwell did not write any summons for the "swerve" or for Harris's operation of a vehicle with alcohol in his system. Crockwell credibly testified that he decided to follow Harris home for safety reasons even given some presumption about intoxication that Virginia law permits with an ultimate BAC of .057. *See* Va. Code § 18.2-269(2). The record is bereft of any notion that the decision to follow Harris to his destination to ensure his safety had coercive effect, especially given that nothing suggests Nunez asked about events unrelated to the stop when he approached Harris.

13

U.S. 33, 39–40 (1996). Accordingly, nothing about the nature of the circumstances indicates coercion.

The evidence demonstrates no coercive factors that would show that Harris's consent was anything but knowingly and voluntarily given. Taking into account the credibility of the witnesses, the evidence presented, and the totality of the circumstances, Harris knowingly and voluntarily consented to a search of his vehicle. Accordingly, the United States met its burden to show by a preponderance of the evidence that the warrantless search was reasonable because it was due to Harris's knowing and voluntary consent.

Finally, the United States met its burden to show that the search did not exceed the scope of the consent given. Harris gave his consent to search his car, without any limiting instructions. Phillips and Nunez searched only the front seats and the surrounding areas, including the inside of an eyeglasses case on the front seat. The facts of this case square with the facts in *Jimeno*, in which the Supreme Court of the United States found it objectively reasonable "for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car." *Jimeno*, 500 U.S. at 251. As in *Jimeno*, it was objectively reasonable for Trainee Phillips and Officer Nunez to consider Harris's general consent to a search of his car to include consent to examine an eyeglasses case found on the front seat. Accordingly, the officers did not exceed the scope of consent.

14

### III.  Conclusion

For the foregoing reasons and for the reasons stated from the bench on February 3, 2016,

the Court will deny Harris's Motion to Suppress. (ECF No. 12.)

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: Feb. 10, 2016

15